This case raises the question for review by the Full Commission of whether or not the defendant's policy of treating absences due to the claimant's suffering from a work-related compensable injury or disease as "Unexcused Absences" under a "no-fault" attendance policy — "meaning for whatever reason you stay out of work, you will be documented for an absence" — giving rise to dismissal for "excessive absenteeism" after six absences is in keeping with the intent of the Workers' Compensation Act for adequately compensating workers who are injured or who incur a compensable occupational disease while engaged in their work with an employer? We find that it is not. The North Carolina Court of Appeals set forth in Seagraves v. Austin Co., of Greensboro,123 N.C. App. 228 , 472 S.E.2d 587 (1996) that "where an employee, who has sustained a compensable injury and has been provided light duty or rehabilitative employment, is terminated from such employment for misconduct or other fault on the part of the employee, such termination does not automatically constitute a constructive refusal to accept employment so as to bar the employee from receiving benefits for temporary partial or total disability" but rather invokes the test as to whether the employee's loss of, or diminution in, wages is attributable to the wrongful act resulting in loss of employment, in which case the employer must first show that the employee was terminated for misconduct or fault, unrelated to the compensable injury (emphasis added). The Court was clearly guarding employees against termination or harassment leading to their voluntary termination as a pretext to denial of benefits.
Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in an Industrial Commission Form 21, Agreement for Compensation for Disability, approved by the Industrial Commission on 7 January 1994, an Industrial Commission Form 26, Supplemental Memorandum of Agreement as to Payment of Compensation, approved by the Industrial Commission on 28 February 1994, a Pre-Trial Agreement and at the hearing as
STIPULATIONS
1. On 13 July 1993, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant.
3. Plaintiff's average weekly wage was $258.00.
4. On 13 July 1993, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant. Plaintiff's injury was a right trigger thumb.
5. A set of exhibits attached to the parties' Pre-Trial Agreement consisting of an employment application and profile forms, job evaluations, a job description, attendance records and discipline records are admitted into evidence.
6. Medical records from defendant; Crawford and Company Rehabilitation Services; Southeastern Neurology Group; Dr. Craig A. Ryder, Eastern Carolina Neurological Associates, Inc.; Dr. Edward Warren, Dr. Gilbert Whitmer; Dr. Jude T. Smith; and a letter from Stephenson Crab Company are admitted into evidence.
*******************
Based upon all of the competent evidence of record, the Full Commission makes the following additional
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was thirty-nine years old, married and the mother of three children. Plaintiff completed the ninth grade of high school. Her work history consisted of employment as a crab picker and an assembly line worker.
2. When she began her employment with defendant in February, 1993, plaintiff worked as a trimmer. As a trimmer, plaintiff was responsible for trimming defects, fat and bones from chicken breasts as they passed her work station on moving hooks. As the breasts passed her station, plaintiff would remove the breasts from the hooks with her left hand and trim them using a pair of scissors. Plaintiff held the scissors in her right hand. Plaintiff made between four and five cuts on each breast. Plaintiff trimmed approximately five breasts per minute.
3. Defendant's employees who worked as trimmers were regularly rotated to other positions that did not require hand movements of the nature performed while trimming. The other positions to which plaintiff and the other employees rotated were tagging, "portions" and weighing. Defendant's policy of rotating trimmers into these other positions was designed to minimize the risk of its employees developing repetitive motion injuries.
4. As a result of her work as a trimmer, plaintiff developed a right trigger thumb during the spring or early summer of 1993. Plaintiff, who was right hand dominant, also contracted bilateral carpal tunnel syndrome.
5. Plaintiff's carpal tunnel syndrome was more severe in her right hand than her left. Plaintiff's employment caused or significantly aggravated her bilateral carpal tunnel syndrome and right trigger thumb. Plaintiff's employment placed her at an increased risk of developing or significantly aggravating her bilateral carpal tunnel syndrome and right trigger thumb as compared to members of the general public not so employed. Due to her right trigger thumb and carpal tunnel syndrome, plaintiff was restricted from work involving the use of scissors or knives.
6. After developing the trigger thumb, defendant initially required plaintiff to increase her rotations into positions that involved less strenuous and repetitive hand movements. These work modifications provided some relief from the symptoms of plaintiff's carpal tunnel syndrome. However, due to continued symptoms related to her right trigger thumb and carpal tunnel syndrome, defendant provided plaintiff with a position in "portions". This position, which did not require the use of scissors, involved inspecting chicken meat for pieces of bone that had been overlooked by the trimmers.
7. Plaintiff's right trigger thumb was initially treated with injections. These treatments failed to provide plaintiff with satisfactory relief. Therefore, on 14 December 1993, Dr. Jude T. Smith performed a surgical release of plaintiff's right trigger thumb, after which she was held out of work for three days. When plaintiff returned to work, she continued to experience right thumb pain. Despite her failure to quickly recover from her surgery, plaintiff continued to perform modified work in the box room where she placed boxes into a chute and sent them down the line. This modified work was considered by defendant to be consistent with her medical restrictions which were that she not use her right arm for three weeks after returning to work.
8. Thereafter, plaintiff returned to her light duty work in "portions" where she picked bones out of chicken portions with her hands. Her symptoms persisted and on March 29, 1994, she sought treatment for pain and weakness in the right hand from Dr. Daniel O. Lee of the Eastern Carolina Neurological Associates, Inc., in Greenville, N.C., to whom she had been referred by her own doctor, Dr. Ed Warren, PA-C, of the Bertie Memorial Hospital in Windsor, N.C. Dr. Lee held her out of work until April 6, 1994, and ordered additional tests, an EMG and nerve conduction studies. The EMG and nerve conduction studies showed right carpal tunnel syndrome. On April 6, 1994, Dr. Lee started the plaintiff on a right cock-up splint and continued her on Voltaren. He then scheduled her for a return appointment around July 6, 1994. Meanwhile, plaintiff was still restricted to light duty work.
9. Due to plaintiff's inability to work as a trimmer and her restriction to the "portions" position, defendant's trimmer rotation schedule was said to be "disrupted". To alleviate this "disruption" and to continue to provide plaintiff with work suitable to her condition, defendant offered plaintiff a night shift position as a "penner". This position required the employee to inspect chickens for feathers that had not been removed by an automated feather remover. The physical requirements of this position were consistent with plaintiff's abilities.
10. The "penner" position was offered to plaintiff during a meeting on 6 July 1994. To allow plaintiff to adjust to the new shift, defendant informed plaintiff that she would not be required to begin the new position until 17 July 1994. Thereafter, plaintiff missed time from work due to her job-caused trigger thumb and/or carpal tunnel syndrome. The defendant deemed plaintiff's absences as a violation of their "no fault" attendance policy and terminated her on 13 July 1994. Plaintiff's violation of defendant's attendance policy did not constitute a constructive refusal to accept suitable employment because the plaintiff's absences from work were the consequence of her job-caused trigger thumb and/or carpal tunnel syndrome.
11. On 9 February 1995, Dr. Whitmer performed a right carpal tunnel release and right trigger thumb release on plaintiff. Following her termination from employment and subsequent surgery, plaintiff was incapable of earning wages from defendant or any other employer. Plaintiff reached maximum medical improvement on 13 April 1995. As a result of her right trigger thumb and right carpal tunnel syndrome, plaintiff has a ten percent permanent impairment of her right hand.
12. Plaintiff's inability to earn wages after 13 July 1994, was not due to her "violation" of defendant's attendance policy, but rather was caused by her trigger thumb and carpal tunnel syndrome.
13. Plaintiff's right trigger thumb and bilateral carpal tunnel syndrome are occupational diseases which were contracted as a result of causes and conditions characteristic of and peculiar to her employment with defendant and are not ordinary diseases of life to which members of the general public not so employed are equally exposed.
14. Plaintiff also had and continues to have fibromyalgia, a condition that primarily affected plaintiff's neck and shoulders. However, Dr. Whitmer also found that "some of the pain that she was having was the result of fibrocytis involvement of the hand and wrist and forearm." While the evidence of record showed by its greater weight that plaintiff's fibromyalgia was significantly aggravated as a result of her employment with defendant, it failed to show that plaintiff's job placed her at greater risk of contracting fibromyalgia than other members of the general public.
15. The defendant admitted liability for plaintiff's right trigger thumb when it signed in October, 1993, an Industrial Commission Form 21, Agreement for Compensation for Disability, approved by the Industrial Commission on 7 January 1994, and an Industrial Commission Form 26, Supplemental Memorandum of Agreement as to Payment of Compensation, approved by the Industrial Commission on 28 February 1994.
16. Since leaving her job with the defendant, plaintiff has been unsuccessful in getting new employment which she sought at McDonald's in Williamston and at Hardee's in Windsor soon after her departure from the defendant's in July, 1994.
17. Dr. Whitmer believes that plaintiff should not seek employment requiring repetitive hand motions and restricted her to not lifting anything over five pounds with her right hand.
18. The defendant has not offered the plaintiff new employment, and has not shown that the plaintiff can obtain suitable employment or that suitable employment is available to the plaintiff.
*******************
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff's trigger thumb and carpal tunnel syndrome, or the aggravation thereof, are due to causes and conditions characteristic of and peculiar to her employment with defendant, are not ordinary diseases of life to which members of the general public not so employed are equally exposed and are, therefore occupational diseases. N.C. Gen. Stat. § 97-53(13); Rutledge v.Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983).
2. A disease is an occupational disease compensable under N.C. Gen. Stat. § 97-53(13) if claimant's employment exposed her to a greater risk of contracting this disease than members of the public generally and such exposure significantly contributed to, or was a significant causal factor in, the disease's development.Rutlege v. Tultex Corp., 308 N.C. 85, 101, 301 S.E.2d 359, 369-70
(1983). Plaintiff's fibromyalgia is not compensable under North Carolina's Workers' Compensation Act since plaintiff has not shown that her employment with defendant exposed her to a greater risk of contracting this disease than members of the public generally.
3. Plaintiff's "violation" of defendant's attendance policy did not constitute a constructive refusal of suitable employment provided by defendant and therefore should not bar her from receipt of disability compensation. The North Carolina Court of Appeals set forth in Seagraves v. The Austin Company ofGreensboro, 123 N.C. App. 228 , 472 S.E.2d 587 (1996) that "where an employee, who has sustained a compensable injury and has been provided light duty or rehabilitative employment, is terminated from such employment for misconduct or other fault on the part of the employee, such termination does not automatically constitute a constructive refusal to accept employment so as to bar the employee from receiving benefits for temporary partial or total disability" but rather invokes the test as to whether the employee's loss of, or diminution in, wages is attributable to the wrongful act resulting in loss of employment, in which case the employer must first show that the employee was terminated for misconduct or fault, unrelated to the compensable injury (emphasis added). The Court was clearly guarding employees against termination or harassment leading to their voluntary termination as a pretext to denial of benefits. N.C. Gen. Stat. § 97-32;Seagraves v. The Austin Company of Greensboro, 123 N.C. App. 228,472 S.E.2d 587 (1996).
4. As a result of her compensable occupational diseases, plaintiff has been incapable of earning wages since her termination by defendant July 13, 1994. The defendant has not offered plaintiff employment, has not demonstrated that she is able to return to work and has failed to make a valid effort at seeking new employment, and has failed to demonstrate that suitable employment is available to the plaintiff. Saums v.Raleigh Community Hospital, ___ N.C. ___, ___ S.E.2d ___ (Filed July 24, 1997; No. 494 PA 96).
5. As a result of her compensable occupational diseases, plaintiff is entitled to payment of temporary total disability compensation at the rate of $172.01 per week from 13 July 1994 through the date of hearing and continuing until she returns to work earning the same or greater wages or until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to payment of all medical expenses incurred or to be incurred as a result of her occupational diseases for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or lessen her disability. N.C. Gen. Stat. § 97-57; N.C. Gen. Stat. § 97-25.
*******************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Subject to the attorney fee provided for below, defendant shall pay plaintiff temporary total disability compensation at the rate of $172.01 per week from 13 July 1994 through the date of hearing and continuing until she returns to work earning the same or greater wages or until further order of the Industrial Commission. The accrued amounts shall be paid in a lump sum.
2. Defendant shall pay all medical expenses incurred or to be incurred in the future by plaintiff as a result of her occupational diseases for so long as such examinations, evaluations and treatments tend to effect a cure or give relief when the bills for same have been submitted and approved through the procedures adopted by the Industrial Commission.
3. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under paragraphs 1 and 2 of this Award is approved for plaintiff's attorney and shall be paid as follows: twenty-five percent of the lump sums due plaintiff shall be deducted from those amounts and paid directly to plaintiff's attorney. Thereafter, plaintiff's attorney shall receive 25% of each weekly check due plaintiff.
4. Defendant shall pay the costs, including an expert witness fee of $200.00 for Dr. Hansen.
 S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ______________________ COY M. VANCE COMMISSIONER
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER